UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-61164-CIV-DIMITROULEAS/SNOW

CHERYL CLARK, M.D.,

                    Plaintiff,

v.

SOUTH BROWARD HOSPITAL
DISTRICT d/b/a MEMORIAL
HEALTHCARE SYSTEM,
                    Defendant.

_____/

### (SEALED) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### WITH INCORPORATED MEMORANDUM OF LAW

Defendant, South Broward Hospital District d/b/a Memorial Healthcare System
("SBHD"), through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56
and Local Rule 7.5, files its Motion for Summary Judgment and Incorporated Memorandum of
Law and respectfully requests that this Court enter summary judgment in its favor on all Counts
of Clark's Amended Complaint.  SBHD also files its Concise Statement of Undisputed Material
Facts ("Statement of Facts"), cited: "Facts ¶ __."  In support, SBHD states:

### PRELIMINARY STATEMENT

Plaintiff, Cheryl Clark, MD, was employed by SBHD as a Critical Care physician
("Intensivist") from January 2005 to March 2012.  Clark contends that SBHD violated Title VII
of the Civil Rights Act ("Title VII") and the Florida Civil Rights Act ("FCRA") by terminating
her employment because she is female and because she filed a Charge of Discrimination.  The
undisputed facts show, however, that SBHD terminated Clark ███████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

1



. Besides her termination, Clark cannot identify any other adverse action taken against her and cannot identify any similarly-situated physician employed at Memorial Regional Hospital ("MRH") treated more favorably.  No male physician employed at MRH has ███████████████████████████████████

███ SBHD continues to employ both of the other female Intensivists, Julie Anne Thompson, MD, and Elizabeth Bugarin, MD.  Bugarin not only remains employed, ██████████████

███████████████████████.  This is significant not only because Bugarin is female, but also because Bugarin filed, at the same time as Clark, a gender-based Charge of Discrimination.  Insofar as SBHD did not terminate Bugarin from employment, no reasonable jury could find that SBHD discriminated against Clark based on gender or protected activity.

Similarly, Clark cannot show that SBHD subjected her to a hostile environment based on gender or protected activity.  The conduct about which Clark complains did not reference gender or protected activity and, in any event, was not severe or pervasive.  In any event, SBHD cannot be held liable for any purported harassment because Clark failed to report most of the conduct despite SBHD's well-disseminated anti-harassment policy.  As to the few reports Clark made, SBHD promptly acted.  Because Clark cannot establish discrimination or retaliations claims, SBHD is entitled to summary judgment on all Counts of the Amended Complaint.

## MEMORANDUM OF LAW

Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if plaintiff fails to satisfy any one of the elements. *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 (11th Cir. 1998).  A federal court should not "sit as a super-personnel department that reexamines an entity's business decisions." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000); *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004).

**I.      Clark Cannot Prove a *Prima Facie* Claim of Gender Discrimination or Retaliation.**

Clark's claims should be analyzed *via* the order and allocation of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell Douglas*, a plaintiff is required to establish, by a preponderance of evidence, a *prima facie* case of unlawful

discrimination (or retaliation). *McDonnell Douglas,* 411 U.S. at 802. If that burden is met, the employer must articulate a legitimate, non-discriminatory (or non-retaliatory) reason for the employment decision. *Id.* at 804. If the employer meets its minimal burden of production, the plaintiff must then prove that the articulated reason "was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507-08 (1993). At all times, the plaintiff bears the burden of proving intentional discrimination/retaliation. *Id.* at 510-12.

### A.   Clark Cannot Establish a *Prima Facie* Case of Gender Discrimination (Counts I and V)

To establish a *prima facie* case of discrimination, Clark must prove that: 1) she is a member of a protected class; 2) she was qualified to perform her job; 3) she was subjected to an adverse employment action; and 4) she was treated less favorably than a similarly-situated male employee. *See, e.g., Nicholas v. Board of T'ees,* 251 Fed. Appx. 637, 643 (11th Cir. 2007); *Rice-Lamar v. City of Fort Lauderdale,* 232 F.3d 836, 842-43 (11th Cir. 2000).[1] Not all conduct by an employer that negatively affects an employee constitutes adverse employment action. *Evans v. Fla. Transp. Servs.,* 2009 U.S. Dist. LEXIS 19766, at *5 (M.D. Fla. Mar. 11, 2009). An adverse employment action is a "serious and material change in the terms, conditions, or privileges of employment." *Id.* at *6; *see also Webb v. IBM,* 458 Fed. Appx. 871, 875-876 (11th Cir. 2012) (noting that Congress did not intend for Title VII to apply where the alleged injury was to an employee's prestige and self-esteem, without any tangible harm); *Miller v. City of Coral Gables,* 2000 WL 33231604, at *6 (S.D. Fla. Oct. 3, 2000) (stating that "not every unkind act that makes an employee unhappy amounts to an adverse employment action.").

To make a comparison, a plaintiff must show that she and other employees outside her class are similarly situated in all relevant aspects. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997). A plaintiff is similarly situated to another employee only if "the quantity and quality of the comparator's misconduct are nearly identical." *Churchill v. City of Panama City Beach,* 2009 U.S. Dist. LEXIS 69017, at *8 (N.D. Fla. May 7, 2008). It is necessary for a court to "consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways". *Id.* at **8-9. Further, an employee's subjective view of the

---

[1] Clark's FCRA claims are analyzed under the same framework as her Title VII claims. *See, e.g., Dep't of Children & Family Servs. v. Garcia,* 911 So. 2d 171 (Fla. 3d DCA 2005). Hence, all arguments concerning Clark's Title VII claims apply equally to her FCRA claims.

significance of an employer's action is not controlling. *Hyde v. K.B. Home, Inc.* 355 Fed. Appx. 266, 269 (11th Cir. 2009); *see also Davis v. Town of Lake Park,* 245 F.3d 1232 (11th Cir. 2001) (finding that an overall "excellent" rating on an evaluation, with a salary increase, suggested that the events complained of did not have a material impact on employment).

Clark claims that because she is female, SBHD: 1) did not allow her to attend Medical Executive Committee (MEC) meetings; 2) did not recognize her as the Vice Chief; 3) did not allow her to serve out the unexpired term of Walter Severyn, MD (former Director of Critical Care), as Chief; 4) told her not to apply for the position of Medical Director, and, when she did anyway, failed to give her an interview; 5) stripped her of schedule-making responsibilities and attendant remuneration; and 6) terminated her from employment.  [See Amended Complaint ("Am. Compl.") ¶65].  Excepting Clark's termination, however, none of SBHD's purported actions constitutes adverse employment action.  Indeed, it is undisputed that throughout Clark's employment, she received ████ evaluations and ████████ [Facts ¶ 2]. Further, even if the alleged conduct were adverse, Clark's claims fail because she cannot identify a similarly-situated male physician employed at MRH whom SBHD treated more favorably.

### 1. **Exclusion from one (timely-asserted) MEC meeting is not adverse**.

Clark contends SBHD "fail[ed] and refus[ed] to allow her to attend the meetings of the MEC."  [Am. Compl. ¶¶ 17, 19].  It was the Chief's responsibility to attend the monthly MEC meetings, and Severyn made it a point to attend them all.  [Facts ¶ 3].  The undisputed record reflects that from 2008 to March 2012, only two (2) meetings were unattended by the Chief:  (1) December 15, 2008; and (2) August 16, 2010.  [Facts ¶ 4].  Because the December 15, 2008, meeting occurred more than 300 days prior to Clark filing her Charge (December 8, 2010), that meeting is not properly before this Court.  *See Amtrak v. Morgan*, 536 U.S. 101, 109 (2002) (holding that a claim is time barred if not filed within the statutory time period).[2]  With regard to the August 16, 2010, meeting, although it occurred after Severyn retired, Severyn requested that Aron Neuhaus, MD, attend. [Facts ¶ 5].  ████████████████████████ ████████████████████████████████████ ████████████████ [Facts ¶ 6].  ████████████ [Facts ¶ 6].  Further, the MEC meetings were in the evening, which Severyn felt would interfere with Clark's work on the night shift. [Facts ¶ 7].

---

[2] Lance Cohen, MD, attended the December 15, 2008, meeting.  [Facts ¶ 5].

Not attending one (or even two) MEC meetings does not rise to the level of an adverse employment action. *See Rivera v. Dept. of Health*, 2012 U.S. Dist. LEXIS 84562, at **7-8 (N.D. Fla. June 19, 2012) (noting that changes in job duties, or exclusions from meetings, when unaccompanied by tangible harm, do not constitute adverse employment acts). Even if not allowing Clark to attend the MEC meetings were adverse, Clark cannot show that SBHD treated a similarly-situated male more favorably. ███████████████████████████████████████████ ████████████████████████████████████████████████████████████.

### 2. **Loss of the Vice Chief role is not adverse.**

Clark contends that SBHD "fail[ed] and refus[ed] to recognize her as the vice chief of the department." [Am. Compl. ¶ 44]. To the contrary, Clark was "recognized" as Vice Chief for more than two (2) years from April 2008 until November 2010. [Facts ¶ 8]. As such, when Macaluso informed Clark, in November 2010, that there would no longer be a vice chief of the Critical Care department, Clark had already held that role for more than two-and-one-half years. [Facts ¶ 9]. In any event, loss of the vice chief role cannot be an adverse employment action because there was no employment contract or additional pay associated with the role, and at no time was Clark's hourly wage ever reduced. [Facts ¶¶ 11, 32]. Yet, even if the refusal to recognize Clark as the vice chief could constitute an adverse action, Clark cannot show that a similarly-situated male was treated more favorably. Since November 2010, *no one – male or female* – has held the role, and further, subsequent to Severyn, *only* Clark held the role; *no* male Intensivist ever again held it. [Facts ¶ 10]. *See Mira v. Monroe County Sch. Bd.,* 687 F. Supp. 1538, 1547 (S.D. Fla. 1988) (finding no gender discrimination where the evidence showed that the position of Assistant Director had not been re-established after it was abolished).

### 3. **Not serving as the Chief is not an adverse action**.

Clark contends SBHD fail[ed] and refus[ed] to allow her to serve out the unexpired term of Severyn as Chief" after Severyn retired. [Am. Compl. ¶ 34]. As a preliminary matter, it is important to distinguish the "chief" role (that Severyn held on the Medical Staff) from the "Medical Director" position (that Severyn held by contract with SBHD). [Facts ¶ 12]. There was no additional pay associated with being "chief". [Facts ¶ 13]. The only additional duty associated with being "chief" was the requirement to attend MEC meetings. [Facts ¶ 13]. Because there is no additional pay, and only one additional duty, associated with being the

"chief" (as distinguished from Director), Clark cannot show that not serving Severyn's unexpired term as "chief" constitutes an adverse action.

Even if not serving as chief could constitute an adverse action, however, Clark cannot identify a similarly-situated male who was treated more favorably. In this regard, like Clark, none of the male Intensivists was selected to serve as "chief" after Severyn retired. [Facts ¶ 14].

████████████████████████████████████████████████████
████████████████  [Facts ¶ 15].  █████████████████████████
████████████████████████████████████████████████████
████████████████████████  [Facts ¶15].  Accordingly, SBHD did not select any Intensivist.[3]

Instead, in August 2010, SBHD selected Seong Lee, MD, a trauma surgeon, to act as the Interim Director of the Critical Care Department. [Facts ¶ 18]. Lee was not an Intensivist in the Critical Care Department, ███████████████████████████████████████████
██████████ Lee is Board Certified in Critical Care and has served since 2009 as the Medical Director of Surgical Critical Care in Trauma Services (leadership experience). [Facts ¶ 19]. As the Interim Director, Lee was also responsible for serving as the Interim Chief. [Facts ¶ 20]. Therefore, Clark's claim must fail because she and male Intensivists were both rejected in favor of someone from outside the department. *See Givens v. Chambers*, 548 F. Supp. 2d 1259, 1273 (M.D. Ala. 2008) (stating that "[w]here employees, including both members of the protected class and non-members, are treated identically, no particular employee can claim that such treatment manifests discriminatory intent on the part of the employer.").

**4.  Not getting interviewed is not an adverse action.**

Clark claims that SBHD "refus[ed] to allow her to apply for the position of Medical [D]irector or Chief and when she did so anyway," SBHD refused to give her an interview. [Am. Compl. ¶ 65d]. As a preliminary matter, Clark's claim is not properly before this Court because she did not include this allegation in either Charge she filed. [Facts ¶ 21]. *See Joseph v. Fla.*

---

[3] In any event, Clark had told Severyn previously that she had no interest in the role. [Facts ¶ 17]. Clark told Severyn that she was quite content to remain more clinically focused and deal less with politics. [Facts ¶ 17]. ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████).

*Quality Truss Indus.,* 2006 U.S. Dist. LEXIS 88254, at *26 (S.D. Fla. Dec. 6, 2006) (stating that a plaintiff's complaint is limited by the scope of the EEOC investigation that "can reasonably be expected to grow out of the charge of discrimination").  To be clear, Clark does not assert that she suffered gender discrimination because she was not selected for the position.  Rather, Clark contends only that SBHD discriminated against her by not interviewing her.

The undisputed facts show, however, that Clark was provided a telephonic interview.  In September 2009, SBHD contracted with a recruiter, Joe Bogan at Providence Healthcare Group in Dallas, Texas, to conduct a nationwide search for a Medial Director to replace Severyn. [Facts ¶ 22].  When Clark submitted her application for the position in December 2010, her resume was forwarded to Bogan.  [Facts ¶ 23].  Bogan contacted Clark to discuss the position. [Facts ¶ 24].  During this telephonic interview, ███████████████████████████ ███████████████████████████████.  [Facts ¶ 24].  Clark also cannot point to a similarly-situated male comparator who was treated more favorably.  Numerous other physicians applied, mostly male, who also did not meet the necessary criteria.  [Facts ¶ 25].

### 5. **Not preparing the schedule is not actionable.**

Clark claims that SBHD discriminated against her by taking away her schedule-making responsibilities.  [Am. Compl. ¶ 65e].  Clark made the schedule for years before it was turned over to Lee in November 2010 when Clark went on an extended personal leave of absence. [Facts ¶ 26].  In this regard, when Clark worked with Critical Care Partners (prior to her employment with SBHD), she volunteered to create the physician schedule. [Facts ¶ 27].  When Clark became employed by SBHD, she continued in her role as "scheduler".  [Facts ¶ 28].  There was no fixed amount paid for doing the schedule; however, Clark reported the "extra" hours she worked and was paid her hourly rate.  [Facts ¶ 29].

Clark, however, went out on a personal leave of absence on November 19, 2010.  [Facts ¶ 30].  After returning for approximately one month in January 2011, Clark took a second leave until May 2011.  [Facts ¶ 31].  Beginning November 19, 2010, Clark took nearly six (6) months of (voluntary) personal leave.  Obviously, during the time Clark was on leave, she could not prepare the schedule.  Because Clark could not prepare the schedule while on a (voluntary) personal leave, Clark's loss of the scheduling cannot constitute an adverse employment action. *Morongell v. Miami-Dade County,* 2008 U.S. Dist. LEXIS 93666, at *15 (S.D. Fla. Nov. 18, 2008) (noting that an employee "cannot create an adverse action through [her] own voluntary

actions."). Regardless, again, Clark cannot point to a similarly-situated male who was treated more favorably. Lee, the Interim Director, assumed responsibility for preparing the schedule. [Facts ¶ 33]. As Lee was the Interim Director at the time he assumed the schedule-making responsibilities, he is not similarly situated to Clark. Furthermore, prior to Clark's leave of absence, no *male* Intensivist had ever prepared the schedule. [Facts ¶ 34]. Since November 2010, no Intensivist has prepared the schedule except the Interim Director/Director. [Facts ¶ 35].

### 6. **Clark's termination from employment is not actionable.**

SBHD concedes that Clark's termination from employment constitutes an adverse employment action. Nonetheless, Clark is unable to establish a *prima facie* claim for gender discrimination because she cannot identify any similarly situated male physician employed at MRH who engaged in the same or similar misconduct but was not terminated. ███████████

████████████████████████████████ [Facts ¶ 36]. ██████████████

████████████████████████████████ [Facts ¶ 37]. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ *See infra* Point II.

### B. **Clark Cannot Show a *Prima Facie* Case of Retaliatory Discharge (Counts IV and VIII).**

To establish a claim of unlawful retaliation, Clark must prove that her protected activity was the "but-for" cause of the purported retaliation. *Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) (holding that but-for causation applies to Title VII retaliation claims). Under the "but-for" standard, "[a]n act or omission is not regarded as a cause of an event if the particular event would have occurred without it." *Id.* To prove a *prima facie* claim for retaliation, Clark must show that: (1) she engaged in statutorily protected activity; (2) her employer was aware of that activity; (3) she suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action. *De Long v. Best Buy, Co. Inc.*, 211 Fed. Appx. 856 (11th Cir. 2006), *cert. den.*, 128 S. Ct. 154 (2007). To establish that she engaged in statutorily protected expression, a plaintiff must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (stating "[i]t thus is

not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.").

Clark contends that SBHD terminated her employment in retaliation for her purported "protected activity." While SBHD concedes that Clark filed a Charge of Discrimination on or about December 8, 2010, Clark could not have reasonably believed that SBHD had subjected her to gender discrimination. In this regard, none of the conduct Clark identified in her Charge as discriminatory constituted an "adverse employment action," and moreover, Clark could not identify a male physician employed at MRH who had been treated more favorably than her. *See supra* Point I.A.1-3, 5. Conversely, it is undisputed that throughout Clark's employment, she received ████████ evaluations as well as ██████████████ each year. [Facts ¶ 2]. In fact, Clark was the ██████████████████████. [Facts ¶ 38].

Moreover, Clark cannot establish a causal connection between her Charge (December 2010) and her termination (March 2012), as these events occurred more than fifteen months apart. *See e.g., Nicholas,* 251 Fed. Appx. at 645 (holding that the three to five months that passed between the plaintiff's charge and the alleged adverse acts was too long to establish a causal link); *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir. 2004) (stating that the U.S. Supreme Court has cited with approval decisions in which a three to four month span was insufficient to show a causal connection) (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268 (2001)); *Gaston v. Home Depot,* 129 F. Supp. 2d 1355, 1377 (S.D. Fla. 2001) (finding three to five months separation between the protected activity and the adverse action insufficient to establish a causal link). Further, Clark's retaliatory discharge claim must fail because her intervening ████████, as reported to SBHD during its investigation, terminated any causal connection that might otherwise have existed. *See Gaston,* 129 F. Supp. 2d at 1377 (citing *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir. 1999)) (stating that intervening unprotected conduct, such as violating an employer's rules or disrupting the workplace, can "erode[] any causal connection that was suggested by the temporal proximity of [the] protected conduct and [the] termination.").

Finally, as described in greater detail *infra* Point II, the undisputed facts show that SBHD terminated Clark not because she filed a Charge (indeed so had Bugarin who remains employed with SBHD today), but instead because she: ████████████████████████████████

████████████████████████████████████████████

██████████████████████████ *See infra* Point II.

**II.**   **SBHD Had Legitimate, Non-Discriminatory and Non-Retaliatory Reason(s) for Its Actions, Which Reason(s) Clark Cannot Establish Are a Pretext for Unlawful Discrimination or Retaliation**.

In showing that a defendant has legitimate, nondiscriminatory reasons for its actions, a defendant's burden is "exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F. 2d 1138, 1142 (11th Cir. 1983). When examining an employer's proffered reasons, "the court does not sit as a super-personnel department, and must accept the employer's stated reasons as given." *Gaston*, 129 F. Supp. 2d at 1373. "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. Moreover, if the employer sets forth multiple reasons, the employee must rebut all of the employer's reasons in order to prevail. *See, e.g., Brown v. Northside Hosp.*, 311 Fed. Appx. 217, 223 (11th Cir. 2009). Notably, the reasons asserted by an employer for its employment decision need not be correct or fair. *Damon v. Fleming Supermarkets, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) (holding that "a defendant may terminate an employee for a good or bad reason without violating federal law"). "[A court's] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

**A.**   **SBHD Had Legitimate, Non-Discriminatory Reasons for its Pre-Termination Decisions**.

Clark was not selected to attend the MEC meeting on August 16, 2010, because ████████

████████████████████████████████████████████

*See supra* Point I.A.1. Clark was no longer recognized as the vice chief because SBHD concluded that, as a fully-employed department, Critical Care did not fit within the organizational model for departments comprised of only staff physicians. The model for departments comprised of only staff physicians consists of an elected chief and vice chief. The organizational model for a fully-employed department logically consists of only an employed Medical Director who then also serves as the Chief. [Facts ¶ 39]. Clark did not serve out the unexpired term of Severyn as Chief because, in the Critical Care Department (a fully-employed

department), the Chief role is performed by the appointed Medical Director (who is also employed) and not by a Chief elected by the Medical Staff. [Facts ¶ 40].

Clark did, in fact, apply for the Medical Director position and was, in fact, interviewed for it. As such, SBHD need not articulate a legitimate non-discriminatory reason for (purportedly) telling Clark not to apply or for (purportedly) not interviewing her. Regardless, Clark admitted to Bogan, who interviewed her, that she ███████████████████████ ████████████████████████████████ *See supra* Point I.A.4. Finally, Clark was removed from scheduling duties because: (1) she took an extended leave of absence for personal reasons during which she could not perform scheduling duties, *see supra* Point I.A.5; and (█ ███████████████████████████████████████████████████████████████ ███████████████████ [Facts ¶ 41].

In this regard, it was reported to SBHD that on November 15, 2010, ████████████ ███████████████████████████████████ [Facts ¶ 42]. ████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████ [Facts ¶ 43]. A meeting was called for November 18, 2010, to discuss, *inter alia*, Clark's scheduling process. [Facts ¶ 44]. The meeting was prompted, in part, because of concerns among the group relating to ███████████████████████████████. [Facts ¶ 45]. Macaluso attended as he was aware of ███████████████████████ ████████████ [Facts ¶ 46].

During the meeting, some of the physicians stated ███████████████████ ████████████████████████ The physicians were not interested in analyzing data, they just wanted a change in the scheduling process – and scheduler. [Facts ¶ 47]. Clark ████████ █████t and left the meeting before it ended. [Facts ¶ 48]. After Clark left, members of the group ███████████████████████████████ [Facts ¶ 49]. Some discussed the fact that ████ ███████████████████████████████. [Facts ¶ 50]. In addition, members of the group reported that ███████████████████████████████████████████████████████ ██████████████████████. [Facts ¶ 51]. ████████████████████████████ ███████████████████████████████████████████████████. [Facts ¶ 52]. █

████████████████████████████████████████████████. [Facts ¶ 52].

**B.**  **SBHD Also Had Legitimate, Non-Discriminatory and Non-Retaliatory Reasons for Terminating Clark's Employment**.

SBHD received multiple reports that Clark: ████████████████████████
████████████████████████████████████████████████████████
████████████

**1.**  █████████████████████████████████████████████.

In January 2012, Aharon Sareli, MD, became Medical Director for Adult Critical Care Services for Memorial Healthcare System.  [Facts ¶ 53].  Shortly after Sareli's appointment, on February 2, 2012, a family reported that █████████████████████████████████ █████████████████████  [Facts ¶ 54].  They █████████████████████████████ ██████████████████████  [Facts ¶ 55].  They specifically requested that █████████████████████████████████  [Facts ¶ 56].  At no time prior had Sareli (who previously had been in leadership roles at Memorial Hospital West and elsewhere) ever received a ███████████████████████████████████████ ██████████████████████████.  [Facts ¶ 57].

Within a week of Sareli investigating ████████████████████████ ███████████████████████  [Facts ¶ 58].  ████████████████████████ ████████████████████  [Facts ¶ 59].  ████████████████████████████████ ████████████████████████████████████████████████████ ███████████.  [Facts ¶ 60].  ████████████████████████ ███████████████████████████████████████████.  [Facts ¶ 61]. ████████████████████████████████████████████████████ ██████████████  [Facts ¶ 62].  ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████  [Facts ¶ 63].

Based on the above reports, Sareli requested an immediate meeting with Zeff Ross, Memorial Regional's Chief Executive Officer; Thomas Macaluso, MD, then-Director of Medical Affairs; Stanley Marks, MD, Chief Medical Officer; Ray Kendrick, Senior Vice President of Human Resources and Chief Diversity Officer; and inside legal counsel (collectively, "Executive

Team"). [Facts ¶ 64]. After confirming with ███████████ their reports to Sareli, a decision was made to hire an outside private investigator, Wayne Black, to conduct an independent inquiry into ███████████. [Facts ¶ 65]. Black interviewed over forty █ ████peers and co-workers. [Facts ¶ 66]. During the investigation, ███████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████ [Facts ¶ 67].

In addition, one co-worker reported that ████████████████████. [Facts ¶ 68]. Additionally, ██████ co-workers reported to Black ████████████ ████████████████████████████████████and reported ██████ had s█████████████████. [Facts ¶ 69]. Black presented his findings, including his draft reports, to SBHD's Executive Team. [Facts ¶ 70]. SBHD's Executive Team reviewed Black's findings and asked for detailed explanations. They went through every witness and line of the report. [Facts ¶ 71].

2. ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████ [Facts ¶ 72]. ████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████. [Facts ¶ 73]. ████████████████████████████████████ ████████████████████████████████. [Facts ¶ 73]. ████████████████████████████████████████████ ████████████████████████████████████████████ [Facts ¶ 73]. ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

[Facts ¶ 74]. ████████████████████████████████████████
████████████████████████████████ [Facts ¶ 75]. ███████
████████████████████████████████████████████████████
████████████████████████████████ [Facts ¶ 76].

      **3.**    ████████████████████████.

In addition, there were a number of complaints that █████████████████
████████████████. For example, in reference to a ██████ doctor, it was reported to
SBHD that █████████████████████████████ [Facts ¶ 77].
It was also reported that ██████████████████████████" when one of
the ████ doctors requested ██████████████████. [Facts ¶ 78]. ███████
████████████████████████████████████████████ [Facts ¶
79]. ████ was also overheard c██████████████████████████."
[Facts ¶ 80].

Meetings were held among members of SBHD's Executive Team on March 9 and 16,
2012, to discuss, among other information ████████████, Black's investigation. [Facts ¶ 81].
The participants in the meeting included Macaluso, Marks, Kendrick, Ross, inside legal counsel,
Williams Sims, Director of Security, and Frank Sacco, President and Chief Executive Officer of
SBHD. [Facts ¶ 82]. Black reviewed his report with the Executive Team, providing copies for
review during the meeting. [Facts ¶ 83]. Kendrick shared with the group ████████████████
████████████████ (which had been reported to him by Margie Vargas, the Human Resources
Director from Memorial Hospital Pembroke, whom Kendrick had charged with investigating
██████████████████████). [Facts ¶ 84]. Based upon the totality of
information the group received ████████████████████████████
████████████████ the decision was made to terminate Dr. Clark's employment. [Facts ¶
85].

SBHD having articulated legitimate, non-discriminatory and non-retaliatory reason(s) for
its action, the burden shifts to the plaintiff to show that the defendant's stated reasons are
pretextual or "unworthy of credence." *Sanchez v. Miami-Dade Dept. of Corr. & Rehab*, 2008
U.S. Dist. LEXIS 37828, at *21 (S.D. Fla. May 8, 2008). Herein, Clark is unable to show pretext
as Bugarin, another female physician employed in the Department of Critical Care, also filed an
EEOC Charge in December 2010. [Facts ¶ 86]. Bugarin, however, remains employed by SBHD

today,  [Facts ¶ 87].

[Facts ¶ 88].

[Facts ¶ 89].   If SBHD wanted to discriminate and/or retaliate against women who file EEOC complaints, certainly Bugarin would not be employed today.

**III.   SBHD Did Not Subject Clark to a Hostile Work Environment Based on Gender or Protected Activity (Counts II, VI, III, VII).**

To establish a hostile work environment claim, Clark must prove:  (1) she was a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on membership in a protected group; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) grounds for holding the employer liable.  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

**A.   SBHD Did Not Subject Clark to a Hostile Work Environment Based on Gender.**

To establish a claim for hostile work environment based on gender, Clark must prove that the alleged harassment was *because of* her gender.  "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  *Oncale v. Sundown Offshore Svcs. Inc.*, 523 U.S. 75 (1998).  To be actionable, the environment must be "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the terms and conditions of" employment *and* create "an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1279-80 (11th Cir. 2003).  This standard requires that the environment be both subjectively offensive to Clark and objectively offensive to a reasonable person.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).

In making this determination, a court should consider all of the circumstances, including the frequency of the discriminatory conduct; the severity of the discriminatory conduct; whether the conduct is threatening or humiliating; and whether the conduct unreasonably interfered with the employee's performance at work.  *Harris*, 510 U.S. at 23.  "Innocuous statements or conduct, or boorish ones that do not relate to" an employee's protected class "are not `counted [in

determining if the plaintiff was subjected to a hostile work environment]." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *overruled on other grounds, Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008).

### 1.  No alleged conduct is of a sexual or gender-based nature.

Clark advances a non-sexual, gender-based harassment claim; that is, she alleges she was subjected to a hostile environment because of her gender, but was subjected to no sexually-charged comments or conduct.  [*See* Am. Compl. ¶¶ 13-57].  In *Oncale*, a same-sex harassment claim, the Supreme Court stated that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale*, 523 U.S. at 80.  To prove such a non-sexual gender claim, a plaintiff may show:  (1) that the plaintiff is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace; or (2) direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace. *Id.*  In the present matter, assuming (without conceding) that this theory of liability is available to a plaintiff, like Clark, not seeking to establish a "same-sex" harassment claim, the undisputed record shows that Clark cannot prove her claim.

"For an act to be considered part of an actionable hostile work environment claim, it must be of 'a sexual or gender-related nature.'" *Agee v. Potter*, 2007 U.S. App. LEXIS 2467, at *5 (11th Cir. Feb. 5, 2007).  As with the allegations in *Agee*, however, the remarks and conduct identified by Clark do not reference gender and do not come anywhere near showing "general hostility to the presence of women in the workplace." *See Agee*, 2007 U.S. App. LEXIS 2467, at *9 (listing allegations and finding them insufficient to establish that the conduct was based on gender or was severe or pervasive); *Smart v. City of Miami Beach*, 2013 U.S. Dist. LEXIS 45003, at *22-23 (S.D. Fla. March 26, 2013) (eschewing non-sexual, non-gender-based harassment evidence and entering judgment for defendant on grounds that semen on a bathing suit, being called a "bimbo" and a "cunt," having a male co-worker walk in during a shower, and being called promiscuous are insufficient to maintain a sexual harassment claim).  In this regard, Clark pleads broadly that comments and conduct in paragraphs 13-57 and 66-70 of her Amended

Complaint show gender-based "harassment."[4]  At most, however, only one of the allegations even arguably concerns gender. *See* Am. Compl. ¶ 41 (stating that a female nurse called Clark a "bitch" or a "witch," though Clark did not hear the comment).

Instead, a number of paragraphs plead merely innocuous workplace comments/conduct: (1) not being asked to attend two out of 72 meetings, (¶¶ 17, 19); (2) being told she was not the "Vice Chief," (¶¶ 28, 44); (3) no longer preparing the schedule, (¶¶ 28, 35);  (4) being referred to as "unapproachable," "intimidating," and the like, (¶¶ 24, 26-27, 43); and (5) being involved in disputes with colleagues, (¶¶ 23, 36, 38, 42, 51).   Other cited paragraphs plead innocuous conduct that did not impact Clark's environment: (a) SBHD "didn't want to hire" Clark, (¶ 15), but she was hired; (b) Clark was told not to apply for the Director position, (¶ 18), but she applied, [Facts ¶ 90]; (c) Macaluso "solicited negative comments" about Clark, (¶ 29), but there is no record evidence he received any comments; (d) Clark alleges she was not interviewed for the Director position, (¶ 34), but she was interviewed by Bogan, [Facts ¶ 91]; (e) before Clark could return from leave, she had to meet with Macaluso, (¶ 40), yet while they did not meet until June 6, 2011, Clark had worked shifts in May, [Facts ¶ 92]; (f) Clark only received 12 shifts upon her return from leave, (¶ 40), but she had only requested 12-14 shifts, and she received 14 shifts in July, [Facts ¶¶ 93, 94]; (g) ██████████████████████████████ ████████████████████████████████████████, [Facts ¶ 95]; and (h) Clark was initially denied review of her credentialing file, but reviewed it only days later, (¶ 49).

Only the one statement that arguably concerns gender (the "bitch/witch" comment) can "be considered part of" Clark's harassment claim.  Yet, this one statement cannot, as a matter of law, be found sufficiently severe or pervasive as to constitute gender-based harassment. *See, e.g., Murphy v. City of Aventura*, 616 F. Supp. 2d 1267, 1275-76 (S.D. Fla. 2009), *aff'd*, 383 Fed. Appx. 915 (11th Cir. 2010) (holding that nine sex-specific comments, made over a period of two years and eight months, were too infrequent to be actionable); *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005) (using vulgar language, occasionally cursing at the plaintiff, and yelling at the plaintiff, "even when taken together, fall short of an objectively offensive work environment"); *Smart*, 2013 U.S. Dist. LEXIS 45003, at *22-23 (entering judgment for

---

[4] A more critical review of the Amended Complaint reveals that only some of the referenced paragraphs allege comments or conduct that can be analyzed under a harassment standard.  [*See* Am. Compl. ¶¶ 14, 17-19, 23-24, 26-29, 34-36, 38, 40-44, 47-53, 55].

defendant finding that semen on a bathing suit, being called a "bimbo" and a "cunt," having a male co-worker walk in during a shower, and being called promiscuous are insufficient to maintain a sexual harassment claim).   Herein, no reasonable person could find the work environment about which Clark complains "abusive."   Nor, given the environment Clark is reported to have created, could Clark have subjectively believed such an innocuous environment as she complains about to be "abusive."   *See supra* Point II.

Further, Clark does not identify any particular "harasser" whom she contends is motivated by "general hostility" or as to whom she could identify "direct comparative evidence" concerning treatment of the sexes in the workplace.   Instead, Clark accuses a plethora of different persons of making single-instance/infrequent remarks or engaging in occasional rude conduct.   *See Vore v. Indiana Bell Telephone Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994) (stating that "[p]ersonality conflicts between employees [simply] are not the business of the federal courts.").

**2.   There is no basis to hold SBHD liable.**

Under the Supreme Court's recent opinion in *Vance v. Ball State University*, 133 S. Ct. 2434, 2443 (2013), none of the alleged "harassers," except Macaluso, was Clark's supervisor. [Facts ¶ 96].   Insofar as Clark's alleged "harassers" were simply co-workers under *Vance*, Clark must prove that SBHD knew or should have known that a hostile environment (based on gender) existed and failed to correct it.   The record shows, however, that Clark only reported gender-based concerns as to the November 18, 2010, meeting (Clark speculated a male would not have been treated similarly), [Am. Compl. ¶¶ 25-27, 29], and Miggins' "bitch/witch" comment, [Am. Compl. ¶¶ 41, 44].   Otherwise, Clark only reported concerns (general, not gender-related) pertaining to █████████████████.   [*See* Am. Compl. ¶¶ 18, 23, 38].   [Facts ¶ 97]. Because, at best, only one of the conduct/comments concerned gender, and because Clark failed to report the greater majority of her allegations in any event, SBHD could not have known of any purported gender-based hostile work environment, and accordingly, cannot be held liable.   As such, Clark cannot establish a *prima facie* case of gender harassment.

**B.   SBHD Did Not Subject Clark to a Hostile Environment Based on Protected Activity.**

To find that an employer subjected an employee to a hostile work environment in retaliation for protected activity, the actions complained of must be sufficiently severe or

pervasive to alter the terms and conditions of employment, thus constituting an adverse employment action. *Gowski v. Peake*, 682 F.3d 1299 (11th Cir. Fla. 2012). As with Clark's gender-based harassment claims, to establish a protected-activity based harassment claim, Clark must show that the harassment was objectively and subjectively severe or pervasive, taking into consideration the factors delineated in Point III.A. *supra*.

As discussed *supra* Point I.B., Clark (only arguably) engaged in protected activity when she filed her Charge on December 8, 2010. [Am. Compl. ¶ 6]. As such, any conduct that occurred prior to December 8, 2010, cannot form the basis of a retaliatory hostile environment claim. Accounting for this limitation, Clark's remaining allegations include: 1) not being interviewed for the Director position, (¶ 34); 2) forbidding Clark to return to work after her leave of absence until she met with Macaluso, (¶ 40); 3) assigning Clark 12 shifts upon her return from leave, (¶ 40); 4) nurse Miggins telling people she had gotten "the bitch" or "the witch" fired, (¶ 41); 5) ███████████████████████████████████, (¶ 42); 6) ███ ███████████████████████████████, (¶ 38); 7) SBHD investigating reports of ██████████████████████, (¶¶ 50, 52, 53); 9) reviewing ████████ in M&M, (¶ 48); 10) ████ reporting he had a ████████████████████ (¶ 51); and 11) Clark being terminated from employment, (¶ 55).

Whereas one alleged comment concerned gender (on its face), ***none*** of the alleged conduct or comments concerns Clarks' protected activity. *See supra* Point III.A.1. Further, Clark's allegations, even if true, are not sufficiently "severe or pervasive" to alter the terms and conditions of her employment. After Clark filed her EEOC Complaint in December 2010, she requested and was approved for two separate leaves totaling nearly six months. [Facts ¶ 101]. From December 2010 through June 2011 (return from leave), Clark could not have experienced any retaliatory environment because she was not at work.[5] This leaves only the following allegations: SBHD did not interview Clark for the Director position (though Bogan did); did not allow her to work until she met with Macaluso (though she did); assigned her only 12 shifts (though she requested that); and reviewed ████████████████████████████.

---

[5] Further, ██████████████████████████ in 2011 because it was already part of Vargas' investigation. [Facts ¶ 102]. And, as concerns ████████████ ██████████████████████████████████, Macaluso informed Clark that the matter had been brought to his attention, and he had already ██████████████████. [ [Facts ¶ 103].

Each of these actions would have occurred regardless of Clark's protected activity. *See supra* Points I and II (identifying reasons for each action).

There is no evidence that the isolated and innocuous events about which Clark complains were based on her protected activity. Nor were they severe or pervasive: they did not physically threaten or humiliate Clark, and they did not unreasonably interfere with her job performance. Further, Clark received certain favorable treatment both before and after her Charge filing: (1) Clark was the only Intensivist since Severyn to hold the Vice Chief title and to have done the scheduling (besides the Directors), [Facts ¶ 10]; (2) Clark ████████████████████ ████████, [Facts ¶ 38]; and (3) Clark received ██████████████████████, [Facts ¶ 2].

Moreover, if SBHD harbored animus against those who file Charges, SBHD would logically have targeted Bugarin, who filed a Charge at the same time and was represented by the same counsel as Clark. [Facts ¶ 104]. Contrary to "targeting" Bugarin, however, SBHD retained Bugarin in its employ and even allowed Bugarin to ██████████████████████ ████████████████████. [Facts ¶ 105]. With SBHD having treated EEOC-Complainant Bugarin – a mirror-image comparator to Clark -- so favorably, no reasonable jury could find that SBHD created a retaliatory hostile work environment against Clark.

### C.   **SBHD is entitled to summary judgment on the *Faragher* Affirmative Defense**.

Even if Clark could establish a hostile work environment claim, however, SBHD would be entitled to summary judgment on its affirmative defense. [DE 49, Third Affirmative Defense]. An employer may demonstrate that it has taken reasonable care to prevent harassment by showing that it has an "effective and comprehensive anti-[sexual] harassment policy." *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997). SBHD has a well-publicized policy forbidding harassment and other offensive comments and conduct, and SBHD strictly enforces that policy. [Facts ¶ 98]. Indeed, the alleged harassment that Clark reported, SBHD investigated. [Facts ¶ 99]. Therefore, Clark knew about, and, in fact, used the policy. [Facts ¶ 100]. Thus, SBHD is entitled to summary judgment on its affirmative defense. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

## CONCLUSION

Based on the foregoing, SBHD respectfully requests that the Court enter summary judgment in favor of SBHD on all Counts of Clark's Amended Complaint.

Dated:   August 14, 2013

Respectfully submitted,

By: _____
Jenna Rinehart Rassif, Esq. (FBN: 56855)
E-mail: jenna.rassif@jacksonlewis.com
Kelly D. Gemelli, Esq.
Admitted *Pro Hac Vice*
E-mail: kelly.gemelli@jacksonlewis.com
JACKSON LEWIS LLP
2 South Biscayne Boulevard, Suite 3500
Miami, Florida  33131
Telephone: (305) 577-7600
Facsimile: (305) 373-4466
Attorneys for Defendant,
SOUTH BROWARD HOSPITAL
DISTRICT d/b/a Memorial Healthcare
System

## CERTIFICATE OF SERVICE

It is hereby certified that on the 14th day of August 2013, the foregoing document was

served via U.S. Mail on Plaintiff's counsel of record on the attached Service List.

By: _____
Jenna Rinehart Rassif

<u>**SERVICE LIST**</u>

CHERYL CLARK, M.D. v. SOUTH BROWARD HOSPITAL DISTRICT
d/b/a MEMORIAL HEALTHCARE SYSTEM

CASE NO.: 12-61164-CIV-DIMITROULEAS-SNOW

**Counsel for Plaintiff, Cheryl Clark, M.D.**
(service by U.S. Mail)

Karen Coolman Amlong, Esq.
Email: *kamlong@theamlongfirm.com*
Patrice P. DiLorenzo, Esq.
Email: PDilorenzo@theamlongfirm.com
The Amlong Firm
500 N.E. 4th St.
Ft. Lauderdale, FL  33301
Telephone:  954-462-1983
Facsimile:  954-523-3192

4842-5357-2885, v. 3

Dated: August 14, 2013

Respectfully submitted,

By: s/Jenna Rinehart Rassif
    Jenna Rinehart Rassif, Esq. (FBN: 56855)
    E-mail: jenna.rassif@jacksonlewis.com
    Kelly D. Gemelli, Esq. Admitted *Pro Hac Vice*
    E-mail: kelly.gemelli@jacksonlewis.com
    JACKSON LEWIS LLP
    2 South Biscayne Boulevard, Suite 3500
    Miami, Florida  33131
    Telephone: (305) 577-7600
    Facsimile: (305) 373-4466
    Attorneys for Defendant,
    SOUTH BROWARD HOSPITAL
    DISTRICT d/b/a Memorial Healthcare
    System

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served by CM/ECF on August 14, 2013, on all counsel or parties of record on the Service List below.

s/Jenna Rinehart Rassif
Jenna Rinehart Rassif, Esq.

## SERVICE LIST

### CHERYL CLARK, M.D. v. SOUTH BROWARD HOSPITAL DISTRICT d/b/a MEMORIAL HEALTHCARE SYSTEM

### CASE NO. 12-61164-CIV-DIMITROULEAS-SNOW

Karen Coolman Amlong, Esq.
Email: *kamlong@theamlongfirm.com*
Patrice P. DiLorenzo, Esq.
Email: *PDilorenzo@theamlongfirm.com*
The Amlong Firm
500 N.E. 4th St.
Ft. Lauderdale, FL  33301
Telephone:  954-462-1983
Facsimile:   954-523-3192

Jenna Rinehart Rassif, Esq.
*jenna.rassif@jacksonlewis.com*
Kelly D. Gemelli, Esq.
Admitted *Pro Hac Vice*
*kelly.gemelli@jacksonlewis.com*
JACKSON LEWIS LLP
One Biscayne Tower
2 South Biscayne Boulevard, Suite 3500
Miami, Florida  33131
Telephone: (305) 577-7600
Facsimile: (305) 373-4466
Attorneys for Defendant,
SOUTH BROWARD HOSPITAL DISTRICT
d/b/a MEMORIAL HEALTHCARE SYSTEM